IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| COREY BLAINE COGGINS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CV 124-042 |
| | ) | |
| MICHAEL THOMAS, Warden, Dodge | ) | |
| State Prison, | ) | |
| | ) | |
| Respondent. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Petitioner, through counsel, brings the above-captioned petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter is currently before the Court on Respondent's motion to dismiss the petition as untimely. For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** Respondent's motion to dismiss be **GRANTED**, (doc. no. 12), this petition be **DISMISSED** as untimely, and a final judgment be **ENTERED** in favor of Respondent.

## I.    Background

In March 2006, a jury in the Superior Court of Columbia County, Georgia, convicted Petitioner of malice murder and felony murder, and the trial court sentenced Petitioner to life in prison for malice murder.[1]  (Doc. no. 1, p. 1; doc. no. 13-4; <u>Coggins v. State</u>, 750 S.E.2d 331 (Ga. 2013).)  The Georgia Supreme Court affirmed the judgment on October 21, 2013.

---

[1]By operation of law, the felony murder conviction was vacated. <u>Coggins</u>, 750 S.E.2d at 332 n.1.

Coggins, 750 S.E.2d at 334. In its opinion, the Supreme Court provided the following summary of the evidence, viewed in the light most favorable to the jury's verdict:

> [O]n August 18, 2001, Coggins and two of his friends got into a fight with Smith [the victim] based on an earlier accusation by one of Coggins' friends, Chris Jarrard, that Smith was a police informant. Following Jarrard's initial accusation that Smith was an informant, Coggins affirmed to Smith repeatedly that he, too, believed that Smith was "snitching" on others. Smith was angered by the accusation, and Coggins took Smith to one of Coggins' friend's houses so that Smith could confront Jarrard about accusing him of being an informant. Smith then confronted and began fighting with one of Coggins' other friends, but eventually Coggins and Jarrard jumped into the fight as well and ganged up on Smith. During the fight, Coggins stabbed Smith twice in the chest, killing him.
>
> The morning after the stabbing, Coggins admitted to a friend that he had been involved in killing someone. A few days later, Coggins admitted to another friend that he had recently stabbed and killed someone. He also admitted to two inmates while he was in the Columbia County Detention Center that he had stabbed and killed Smith.

Id. at 333. Petitioner filed for a writ of certiorari to the United States Supreme Court, but the petition was denied on May 19, 2014. Coggins v. Georgia, 572 U.S. 1119 (2014).

Petitioner filed a *pro se* state petition for a writ of habeas corpus in the Superior Court of Macon County on July 1, 2014. (Doc. no. 1, p. 3; doc. no. 13-5.) The state habeas petition transferred twice thereafter to different Superior Courts, (doc. no. 1, p. 3), and a state habeas hearing was held on December 4, 2018, by which time Petitioner was represented by the same counsel currently representing him in these federal proceedings. (Doc. no. 14-7, p. 1.)[2] The state habeas court denied relief in a written order filed August 19, 2019. (Doc. no. 13-13.) The Georgia Supreme Court denied a Certificate of Probable Cause to Appeal ("CPC") on January 11, 2023, (doc. no. 13-14), and after denial of a motion for

---

[2]For uniformity and ease of reference, throughout the Report and Recommendation, the Court cites to the document and page numbers as assigned by the Court's electronic filing system at the top of each page.

reconsideration, (doc. no. 1, p. 4), the remittitur issued on February 13, 2023.  (Doc. no. 13-15, Coggins v. Tatum, S20H0188 (Ga. Feb. 13, 2023).)  Petitioner then filed a petition for writ of certiorari to the United States Supreme Court, but the petition was denied on October 2, 2023.  (Doc. no. 13-16, Coggins v. Tatum, No. 22-7877, 144 S. Ct. 176 (U.S. Oct. 2, 2023).)

Petitioner executed the instant federal habeas corpus petition on March 15, 2024, (doc. no. 1, p. 15), and counsel filed it on April 5, 2024.  (Id. at 1.)   He raises several claims for relief based on alleged ineffective assistance of trial and appellate counsel, violation of the principles of Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), and violation of his due process rights based on the time lapse from conviction to the conclusion of state post-conviction proceedings.  (See generally doc. nos. 1, 6.)   Respondent moves to dismiss the federal petition as time-barred under 28 U.S.C. § 2244(d).  (See doc. nos. 12, 12-1, 16.)  Petitioner opposes the motion to dismiss, (doc. nos. 14, 18), arguing that his failure to file the federal petition within the applicable one-year statute of limitations should be excused because "a credible claim of actual innocence entitles him to equitable tolling."  (Doc. no. 14, p. 1.)

## II.    The Petition Is Time-Barred

Pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2244(d), there is a one-year statute of limitations for § 2254 petitions that runs from the latest of:

> (1)(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

 (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

 (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Under § 2244(d)(1)(A), a judgment becomes final upon "the conclusion of direct review or the expiration of the time for seeking such review."  Here, the United States Supreme Court denied the petition for a writ of certiorari on May 19, 2014, Coggins, 572 U.S. 1119, and his conviction therefore became final that day.  See Jimenez v. Quarterman, 555 U.S. 113, 119 (2009) ("[T]he conclusion of direct review occurs when 'this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari.'" (citation omitted)); Torres v. Sec'y, Fla. Dep't of Corr., No. 21-14331, 2023 WL 2682116, at *4 (11th Cir. Mar. 29, 2023) (per curiam) ("Ordinarily, a state prisoner's conviction becomes final when the U.S. Supreme Court denies certiorari or issues a decision on the merits, or when the 90-day period in which to file a certiorari petition expires." (citing Nix v. Sec'y for Dep't of Corr., 393 F.3d 1235, 1236-37 (11th Cir. 2004))).  Thus, Petitioner would have had one year from May 19, 2014 to file a challenge to his 2006 malice murder conviction, subject to application of any statutorily-based or equitable tolling.

The Court recognizes that, pursuant to 28 U.S.C. § 2244(d)(2), the one-year statute of limitations does not run while a properly filed application for state post-conviction relief or other collateral review is pending in state court.  Cramer v. Sec'y, Dep't of Corr., 461 F.3d

1380, 1383 (11th Cir. 2006).  Forty-three days after the Supreme Court denied certiorari, Petitioner filed a *pro se* state habeas corpus petition on July 1, 2014, (<u>see</u> doc. no. 1, p. 3; doc. no. 13-5), and so AEDPA's one-year clock remained tolled throughout the habeas corpus proceedings in state court, including the time during which Petitioner sought a CPC from the Georgia Supreme Court and until issuance of that Court's remittitur on February 13, 2023, (doc. no. 13-15).  <u>See</u> <u>Dolphy v. Warden, Cent. State Prison</u>, 823 F.3d 1342, 1345 (11th Cir. 2016) (*per curiam*) ("[W]hen a state habeas petitioner seeks a certificate of probable cause from the Georgia Supreme Court and the Court denies the request, the petitioner's case becomes complete when the Court issues the remittitur for the denial." (citations omitted)).  However, once the remittitur issued, Petitioner filed a petition for writ of certiorari to the United States Supreme Court, which was denied on October 2, 2023. <u>Coggins</u>, 144 S. Ct. 176.

Petitioner then waited until April 5, 2024, to file the instant federal petition, well over one year past the February 13, 2023 issuance of the remittitur for the CPC denial.[3]  Petitioner incorrectly stated in his original petition that his filing was timely, (doc. no. 1, p. 13), and when faced with Respondent's motion to dismiss, Petitioner correctly concedes the untimeliness but argues his dilatoriness should be excused.  (Doc. no. 14, p. 14 (acknowledging time from denial of application to appeal state habeas decision through denial of application for certiorari to United States Supreme Court counts against statute of

---

[3]The prison mailbox rule" requires the Court to presume the date of filing is the date a prisoner executes the petition and delivers it to prison officials for mailing.  <u>See</u> <u>Houston v. Lack</u>, 487 U.S. 266, 275-76 (1988); <u>Daniels v. United States</u>, 809 F.3d 588, 589 (11th Cir. 2015) (*per curiam*).  Here, however, Petitioner is represented by counsel.  Yet, even if the Court were to apply the date Petitioner signed the petition, March 15, 2024, prior to returning it to counsel for filing on April 5, the petition is still untimely.

limitations calculation but should not bar Petitioner's federal claims because "he is absolutely innocent"); see also id. at 1-2 (contending "any failures to correctly count the days while he had a petition for certiorari pending from the denial of his application to appeal filed before the Supreme Court" should be excused because of a credible claim of actual innocence).)   Because the federal petition was filed well over a year after Petitioner's conviction became final on February 13, 2023 – indeed forty-three days of the one-year statute of limitations expired even before Petitioner filed his original state habeas petition – the instant petition is untimely.

**III.   The Limitations Period Was Not Otherwise Reset under AEDPA, and Petitioner Has Not Shown that He Is Entitled to Equitable Tolling or that a Fundamental Miscarriage of Justice Has Occurred**

Petitioner has not provided any explanation that would delay or reset his one-year statute of limitations under any statutory sections of AEDPA set forth above.  See 28 U.S.C. § 2244(d)(1)(B)-(D).   Nevertheless, an otherwise untimely § 2254 petition may be considered if a petitioner can demonstrate that either he is entitled to equitable tolling or that a fundamental miscarriage of justice has occurred.

**A.   Equitable Tolling Is Not Warranted**

Equitable tolling can be applied to prevent application of AEDPA's statutory deadline, but only if a petitioner "shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)); see also Lawrence v. Florida, 549 U.S. 327, 336 (2007).   Nevertheless, equitable tolling is typically applied sparingly, Steed v. Head, 219 F.3d 1298, 1300 (11th Cir. 2000), and is available "only in truly extraordinary circumstances."   Johnson v. United

States, 340 F.3d 1219, 1226 (11th Cir. 2003), *aff'd* 544 U.S. 295 (2005).  The petitioner bears the burden of proving his entitlement to equitable tolling.  San Martin v. McNeil, 633 F.3d 1257, 1268 (11th Cir. 2011).

Moreover, the petitioner will not prevail based upon a showing of either extraordinary circumstances or diligence alone; he must establish both.  See Cadet v. Fla. Dep't of Corr., 853 F.3d 1216, 1225 (11th Cir. 2017) ("[B]ut the reasonable diligence and extraordinary requirements are not blended factors; they are separate elements, both of which must be met before there can be any equitable tolling." (citations omitted)); Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1072 (11th Cir. 2011).  Vague or conclusory allegations are insufficient to satisfy Petitioner's burden to show how he acted with diligence.  Lugo v. Sec'y, Fla. Dep't of Corr., 750 F.3d 1198, 1209-10 (11th Cir. 2014).  As to establishing an extraordinary circumstance, Petitioner must show a causal connection between the alleged circumstance and the late filing, San Martin, 633 F.3d at 1267, and the extraordinary circumstance must be "unavoidable even with diligence."  Sandvik v. United States, 177 F.3d 1269, 1271-72 (11th Cir. 1999) (*per curiam*).

Here, Petitioner does not meet either prong of the test for applying equitable tolling.  First, Petitioner argues he has been pursuing his rights diligently because "he has met every other time limitation and the State has delayed his quest to show he is actually innocent during the past eighteen (18) years by denying him due process of law." (Doc. no. 14, pp. 1-2.)  He details the timeline of his direct and collateral proceedings in state court and emphasizes the deadlines in those proceedings that he did meet.  (See id. at 3-4, 6, 11-12.)  What Petitioner fails to explain, however, is how he pursued his rights diligently from the

point at which the remittitur issued on his rejected application for a CPC on February 13, 2023, and the filing of his federal petition on April 5, 2024.

The record is clear Petitioner opted to appeal the denial of the CPC to the United States Supreme Court, a period of time which does not toll the statute of limitations. See Lawrence, 549 U.S. at 332 ("[A] state postconviction application 'remains pending' [for purposes of the tolling provision of § 2244(d)(2)] 'until the application has achieved final resolution through the State's postconviction procedures.' This Court is not a part of a 'State's post-conviction procedures." (citation omitted)); see also Chavez, 647 F.3d at 1063 n.4 ("[B]ut the filing of the certiorari petition [to U.S. Supreme Court] and the date it was denied are irrelevant for calculating the statutory tolling of AEDPA's statute of limitations." (citing Lawrence, 549 U.S. at 332).) Petitioner's contention this period of time during which he opted to appeal to a *federal* court regarding the action of a *state* court in denying the CPC request should not count against him because of his prior activities in state court is offered without benefit of any supporting legal citation, and as set forth above, flies in the face of existing Supreme Court precedent.

Second, focusing entirely on diligent pursuant of his rights in state court, Petitioner does not even attempt to argue any extraordinary circumstances prevented him from timely filing his federal petition. As the application of equitable tolling requires satisfaction of both prongs of the two-part test, even if Petitioner could satisfy the diligence prong – which he does not – his plea for equitable tolling fails because he did not argue, let alone establish, extraordinary circumstances prevented him from timely filing his federal petition. See Holland, 560 U.S. at 649; Cadet, 853 F.3d at 1225; Doe v. United States, 469 F. App'x 798, 799-800 (11th Cir. 2012) (*per curiam*); Chavez, 647 F.3d at 1072. There is no causal

connection between Petitioner's years-long activities in state court and his ability to timely file a federal petition once his state collateral proceedings concluded in February 2023 such that equitable tolling might be available to him.  See Lugo, 750 F.3d at 1209 ("[A]n argument that fails to explain how such impediments prevented the timely filing of the petition, does not establish extraordinary circumstances."); Lawrence V. Florida, 421 F.3d 1121, 1226-27 (11th Cir. 2005); see also Mitchell v. Ward, No. CV 421-227, 2022 WL 4359071, at *1 (S.D. Ga. Sept. 20, 2022) (rejecting equitable tolling where no detail given of efforts to pursue relief during the period AEDPA statute of limitations actually expired) (Baker, C.J.).

Pretermitting any argument Petitioner should not be held accountable for the actions of his attorney who did not correctly calculate the federal statute of limitations, the Eleventh Circuit has repeatedly held such mistakes by counsel are not an extraordinary circumstance warranting equitable tolling.  See Cadet, 853 F.3d at 1235; Johnson v. Fla. Dep't of Corr., 513 F.3d 1328, 1333 (11th Cir. 2008); Lawrence, 421 F.3d at 1226; Steed v. Head, 219 F.3d 1298, 1300 (11th Cir. 2000); Sandvik, 177 F.3d at 1272.  This is particularly true where a petitioner, even when represented by counsel, fails to identify any independent steps he took during the relevant time period to ascertain the filing deadline.  See Pabon v. Warden, 718 F. App'x 880, 883 (11th Cir. 2017) (per curiam); Melson v. Comm'r, Ala. Dep't of Corr., 713 F.3d 1086, 1089-90 (11th Cir. 2013) (per curiam); Johnson, 513 F.3d at 1333; see also Arthur v. Allen, 452 F.3d 1234, 1253 (11th Cir. 2006) (requiring federal petitioner seeking to invoke equitable tolling to explain "any independent efforts he made to determine when the relevant limitations period began to run" (citation omitted), modified on other grounds 459 F.3d 1310 (11th Cir. 2006)); Howell v. Crosby, 415 F.3d 1250, 1252 (11th Cir. 2005)

(finding no basis for equitable tolling "especially when the petitioner cannot establish his own diligence in ascertaining the federal habeas filing deadline").

In sum, Petitioner has not carried his "strong burden to show specific facts to support his claim of extraordinary circumstances and due diligence." Brown v. Barrow, 512 F.3d 1304, 1307 (11th Cir. 2008) (*per curiam*) (citing Akins v. United States, 204 F.3d 1086, 1089-90 (11th Cir 2000)).  Therefore, Petitioner is not entitled to the application of equitable tolling.

### B.      Petitioner Does Not Satisfy the Actual Innocence Gateway Exception

Petitioner also argues the untimeliness of his petition should be excused because he "is actually innocent of the crime for which he was convicted."  (Doc. no. 14, p. 1.) Respondent contends this is not the rare case where a credible actual innocence claim has been established such that the untimeliness should be excused.  (Doc. no. 16, pp. 6-14.)  As explained below, Petitioner has not satisfied the demanding requirements of the actual innocence gateway exception that would permit consideration of the merits of his untimely federal claims.

Consideration of an otherwise untimely petition for federal habeas corpus relief may be appropriate upon a showing that a "fundamental miscarriage of justice" has occurred, whereby "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  McQuiggin v. Perkins, 569 U.S. 383, 392 (2013) (citing Herrera v. Collins, 506 U.S. 390, 404 (1993) and Murray v. Carrier, 477 U.S. 478, 495-96 (1986)); see also Wyzykowski v. Dep't of Corr., 226 F.3d 1213, 1218-19 (11th Cir. 2000).  The actual innocence gateway standard is demanding, and "in virtually every case, the allegation of actual innocence has been summarily rejected."  Calderon v. Thompson, 523 U.S. 538, 559

(1998) (citation omitted).  Petitioner bears a heavy burden to make it through the actual innocence gateway, and he no longer has the benefit of any presumption of innocence. Kuenzel v. Allen, 880 F. Supp.2d 1162, 1176 (N.D. Ala. 2009) (citing Schlup v. Delo, 513 U.S. 298, 326 n.42 (1995)), *aff'd sub nom.* Kuenzel v. Comm'r Ala. Dep't of Corr., 690 F.3d 1311 (11th Cir. 2012).  The actual innocence exception "is exceedingly narrow in scope," and a time-barred petitioner seeking to invoke it must be able "(1) to present 'new reliable evidence . . . that was not presented at trial,' and (2) to show 'that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt' in light of the new evidence."  Rozzelle v. Sec'y, Fla. Dep't of Corr., 672 F.3d 1000, 1011 (11th Cir. 2012) (*per curiam*) (citations omitted).

In Schlup v. Delo, the Supreme Court explained a credible claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence  – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  513 U.S. at 324.  As United States District Judge J. Randal Hall has explained, a petitioner must show his evidence was "not available at trial and could not have been discovered earlier through the exercise of due diligence."  Rivera v. Humphrey, No. CV 113-161, 2017 WL 6035017, at *11 (S.D. Ga. Dec. 6, 2017) (citations omitted); see also Mitchell v. Ward, No. CV 421-227, 2022 WL 4362296, at *7 (S.D. Ga. Aug. 26, 2022), *adopted by* 2022 WL 4359071 (S.D. Ga. Sept. 20, 2022) (Baker, C.J.); Whitaker v. Ward, No. CV 121-092, 2021 WL 5742538, at *1-2 (S.D. Ga. Dec. 2, 2021) (Hall, J.)  Stated otherwise, Petitioner must show the evidence offered in support of the actual innocence exception "was not presented at trial <u>and</u> was not available to be presented at trial."  Rivera, 2017 WL 6035017, at *12.

Moreover, "[t]his 'new' evidence must do more than counterbalance the evidence that sustained the petitioner's conviction.  [It] must be so significant and reliable that, considered with the trial record as a whole, it undermines confidence in the result of the trial. . . ."  Id.; see also Schlup, 513 U.S. at 327-28 ("The emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial.").  "New evidence that merely undermines the state's theory of the case but does not rebut specific jury findings of guilt is insufficient to demonstrate actual innocence."  Kuenzel, 880 F. Supp.2d at 1178 (citation omitted).  A petitioner must do more than show reasonable doubt in light of the new evidence.  Id. at 1179.

Thus, "tenable actual-innocence gateway pleas are rare:  '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  McQuiggin, 569 U.S. at 386 (citations omitted).  "In other words, a court may determine that, as factfinder, it would return a verdict of not guilty, yet still reject a petitioner's argument that he is actually innocent"  Kuenzel, 880 F. Supp.2d at 1179.  Importantly, "actual innocence means factual innocence, not mere legal insufficiency."  Ray v. Mitchem, 272 F. App'x 807, 810 (11th Cir. 2008) (per curiam) (citing Bousley v. United States, 523 U.S. 614, 623 (1998)).

Moreover, the actual innocence exception is not a freestanding actual innocence claim.  As Judge Hall has explained:

> It is only a method by which a prisoner may obtain review of an otherwise unreviewable claim.  Procedurally defaulted or time-barred claims may only gain entrance through the actual-innocence gateway "'where the prisoner supplements his constitutional claim with a colorable showing of factual innocence.'"  In other words, "a claim of actual innocence is not itself a constitutional claim, but instead a gateway through which a habeas petitioner

must pass to have his otherwise barred constitutional claim considered on the merits."

Rivera, 2017 WL 6035017, at *10 (internal citations omitted).  As the Eleventh Circuit has stated, "The prohibition on freestanding claims of actual innocence in a habeas petition respects the nature of our federal system:  'Federal courts are not forums in which to relitigate state trials.'  Herrera v. Collins, 506 U.S. 390, 401, 113 S. Ct. 853, 122 L.Ed.2d 203 (1993) (quoting Barefoot v. Estelle, 463 U.S. 880, 887, 103 S. Ct. 3383, 77 L.Ed.2d 1090 (1983))."  Raulerson v. Warden, 928 F.3d 987, 1004 (11th Cir. 2019).

### 1.    Petitioner's Evidence

According to Petitioner, "there is overwhelming evidence that was not produced at trial that if produced no reasonable juror would have convicted [him].  Schlup v. Delo, 513 U.S. 298 (1995).  This includes but is not limited to, the false testimony of Timothy Wayne Osborne (Osborne) who, unknown to [Petitioner] received a substantial benefit for his implied agreement to testify against [Petitioner]."  (Doc. no. 14, p. 2.)  The catch-all "includes but is not limited to" language is not specifically explained.  The only straightforward statement of evidence supporting the actual innocence exception is found under the heading, "Coggins has met the Standard of Review by making a credible showing of actual innocence to invoke equitable tolling to the 1-year limited period under [AEDPA]."[4]  (Id. at 17.)  In this portion of his opposition briefing, Petitioner discusses only the alleged fabricated testimony of Osborne which he allegedly offered in exchange for a

---

[4]Petitioner confusingly uses equitable tolling terminology in his argument for an actual innocence exception.  They are two different concepts.  See McQuiggin, 569 U.S. at 392 (explaining difference between actual innocence *exception* to one-year statute of limitation and equitable tolling *extension* of time statutorily prescribed for filing).  As explained in Part III(A), Petitioner is not entitled to the application of equitable tolling.

lighter sentence in a pending case against him and an undeveloped claim that after Petitioner was convicted, an "unknown person" said the "wrong man was convicted," but nothing was done to investigate his conclusory claim.[5] (Doc. no. 14, pp. 17-19.) As there are no details offered in support of this post-conviction revelation, it obviously fails to satisfy the stringent requirement of offering new evidence, let alone that this unidentified declaration would result in no reasonable juror convicting Petitioner, particularly in light of the other evidence presented at trial and discussed in detail below. See McQuiggin, 569 U.S. at 386; Rozzelle, 672 F.3d at 1011. Moreover, Petitioner's briefing focuses on Osborne and provides no details about this alleged revelation, firmly asserting, "The only basis for any conviction are the testimony and letters written by Osborne and [Michael] Robinson," which Petitioner now contends were false based on Osborne's post-trial recantation.[6] (Doc. no. 14, p. 22.)

The second category of "new evidence" consists of information gleaned from the Public Defender's file[7] which Petitioner now argues would have established his innocence if only trial counsel had used it and not relied on co-defendant's counsel to investigate the case as part of an undisclosed joint defense agreement, including the following: the co-defendant admitted to a deputy sheriff and to his girlfriend that he stabbed the victim in self-defense; there was blood from the victim found on the co-defendant; unpresented witnesses could

---

[5]Indeed, the email regarding this claim provides no details to support the assertion that "the wrong man" was convicted, the wife of the victim knows who the actual killer is, and she lied to the police about what she knew. (See doc. no. 14-7, pp. 130-31.)

[6]As discussed in more detail in Part III(B)(2) below, Michael Robinson was confined at the Columbia County Detention Center at the same time as Petitioner and Osborne, and wrote a letter exhibited at trial mirroring similar facts as those presented in Osborne's letters regarding Petitioner's inculpatory statements to him about the murder for which Petitioner was convicted. (Doc. no. 14-10, pp. 121, 127-31, 133-36 ; doc. no. 14-11, p. 144 (State's Ex. 22).)

[7]The index to the Public Defender's file and select pages of it are attached to Petitioner's opposition to the motion to dismiss. (Doc. no. 14-2, pp. 22-80.)

have refuted testimony from trial witnesses Brian Benning and William Brandon Taylor that shortly after the murder, Petitioner admitted killing someone who had been stabbed. (Doc. no. 14, pp. 8-10, 14, 21-22; doc. no. 18, pp. 5, 17, 19.)   According to Petitioner, the undisclosed, joint defense agreement explains why the information in the file was not investigated, as trial counsel was ineffective for having allegedly relied on co-defendant's retained counsel to investigate the case. (Doc. no. 14, pp. 7, 20; doc. no. 18, pp. 6, 11-12.)

### 2.      Osborne Testimony

Petitioner and co-defendant Barry Tabor ("Tabor") were charged with murder in June, 2005. (Doc. no. 14-7, pp. 141-43.)   At a joint trial, Petitioner was represented by Public Defender David Weber ("Weber"), and Tabor was represented by retained counsel, J. Andrew Tisdale and C. Scott Connell. (Doc. no. 14-8, pp. 1-2.)   Weber and Tabor's retained counsel "entered in an informal agreement to cooperate with each other in the presentation of a unified defense to the charges." (Doc. no. 14-7, p. 84.)   Weber never told him about the agreement with Tabor's attorneys. (Id. at 63.)   That agreement remained in effect until the point mid-trial when the prosecution decided to nolle prosequi the charges against Tabor because of insufficient evidence to convict. (Id. at 84; doc. no. 14-10, pp. 112-20.)

After the charges were dismissed against Tabor, the State called two witnesses who had been detained with Petitioner at the Columbia County Detention Center while he was awaiting trial.   Michael Robinson ("Robinson") testified Petitioner admitted stabbing the victim; the fight leading up to the murder on August 18, 2001 was supposed to be a "scare tactic," and Petitioner only meant to wound the victim while two others, Tabor and Chris Jarrard ("Jarrard"), held him down. (Doc. no. 14-10, pp. 121-28.)   Osborne testified that Petitioner asked him how to beat a murder charge and in the course of their subsequent

discussions of the topic, Petitioner twice told him that he (Petitioner) had stabbed the victim and Jarrard got rid of the knife used in the stabbing. (Id. at 138-43.) Osborne testified that he was not hoping to receive some kind of benefit or reward for his testimony. (Id. at 149-50.) Both Robinson and Osborne also sent letters to a local newspaper reporter detailing the admissions from Petitioner, as well as detailing Tabor's alleged description of holding the victim while Petitioner stabbed him. (Doc. no. 14-11, pp. 144-49 (State's Exs. 22, 23), 161-63 (State's Ex. 39 ).) One of Osborne's letters stated he would trade his testimony for a lighter sentence and could not resist "this golden opportunity." (Doc. no. 14-11, p. 163.) All three letters went to the jury during their deliberations. (Doc. no. 14-11, p. 180.)

First, the Court finds this evidence concerning Osborne's alleged false testimony about Petitioner's confessions and an implied benefit he obtained for his sentence, is new evidence. Respondent incorrectly posits the evidence is not "new" because Petitioner knew of, indeed unsuccessfully raised, the evidence in the motion for new trial, on direct appeal, and in the state habeas proceedings. (Doc. no. 16, pp. 9-10.) For the actual innocence exception, evidence is "new" if it was unavailable at trial and could not have been discovered earlier through the exercise of due diligence. Rivera, 2017 WL 6035017, at *11; see also McQuiggin, 569 U.S. at 389, 401 (allowing for consideration of actual innocence evidence discovered six years before filing habeas petition). While the issues of false testimony and an implied deal for Osborne's testimony may have been raised in prior *post*-conviction proceedings, it was not available to Petitioner at trial, and could not have been discovered with due diligence, so the evidence is "new" for these purposes.

### a.   Alleged **Brady** Violation

The evidence does not support the premise of Petitioner's Brady argument concerning

the existence of a deal between the prosecution and Osborne for his trial testimony because the very affidavit offered in support of the argument states the prosecutor told Osborne "he could not promise me anything, but he implied to me that if I offered favorable testimony, I would have favorable treatment on the armed robbery case that I was facing." (Doc. no. 14-6, p. 4 ¶ 8 (emphasis added).)  This comports with Osborne's trial testimony on March 22, 2006, that he had already spoken with the prosecutor and knew he did not trade testimony for a lighter sentence.  (Doc. no. 14-10, pp. 1, 149-50; see also doc. no. 14-16, p. 8 (explaining at September 12, 2006 Osborne sentencing that assistance at trial was not in exchange for leniency, as was testified to at trial).)  It also comports with the testimony of Osborne's sentencing counsel who testified during the state habeas proceedings that as they were just moments away from sentencing, after having agreed to "a blind plea, straight up plea, there were no deals in place," Osborne started talking out *his expectation* of a benefit from his trial testimony – not there there was an actual deal.  (Doc. no. 14-7, p. 25.)  That is, even if Osborne received some benefit at his sentencing, there is certainly nothing in the record to suggest there was a deal in place, or even implied by the prosecutor, prior to Osborne's testimony that should have been disclosed under Brady.[8]  Indeed, the record shows there was no agreement in place and when Osborne's counsel contacted the prosecutor just prior to sentencing to remind him "we're looking for some benefit," at that point, the prosecutor agreed to reduce the charge against Osborne.  (Id.)

---

[8]The state habeas court also considered and rejected Petitioner's claim the State failed to reveal an implied deal with Osborne to obtain his trial testimony.  (Doc. no. 13-13, pp. 8-10.)  Although Petitioner spends much of his briefing arguing why the state habeas court was wrong, the *merits* of the federal petition are not currently before the Court.  Rather, the Court is only determining whether the actual innocence exception should allow for consideration of the otherwise untimely petition.  As discussed above, the alleged Brady violation is insufficient to meet Petitioner's high burden.

Moreover, even if there were a Brady violation, and as discussed above the record does not support that conclusion – such a violation provides no basis for satisfying actual innocence exception.  Petitioner's reliance on Williams v. Williams, 232 F. Supp.3d 1318, 1327-29 (S.D. Ga. 2017), is easily distinguished.  (Doc. no. 14, p. 10.)  In Williams, the petitioner's conviction was upheld on direct appeal, and he subsequently filed a  petition for a writ of habeas corpus in superior court.  Unlike Petitioner here, the petitioner in Williams *timely* filed a § 2254 petition in federal court after his petition was denied by the state courts, and the federal court granted relief after finding the prosecution violated its duties under Brady, by failing to disclose an unofficial leniency deal it made with trial witness Isaac Fitzgerald, who identified Williams at trial.  See Williams, 232 F. Supp.3d at 1324-33, *aff'd* 714 F. App'x 958 (11th Cir. 2017) (*per curiam*).

Here, however, Petitioner did not timely file his § 2254 petition, and he cannot establish that no reasonable juror would have found him guilty in light of the implied deal with Osborne for a lighter sentence.  The Supreme Court has addressed whether evidence of a Brady violation meets the high threshold of the actual innocence exception.  In Sawyer v. Whitley, the Supreme Court ruled, "This sort of latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness's] account of petitioner's actions."  505 U.S. 333, 349 (1992).  Three years later, the Court overturned the "clear and convincing standard" used in Sawyer in lieu of today's "more likely than not" standard, but the Court's view of impeachment evidence remains the same.  Schlup, 513 U.S. at 327; McQuiggin, 569 U.S. at 395.

In Calderon v. Thompson, the Supreme Court ruled, "This impeachment evidence provides no basis for finding a miscarriage of justice.  As in Sawyer, the evidence is a step removed from evidence pertaining to the crime itself."  523 U.S. 538, 563 (1998) (citation omitted).  To find that impeachment evidence would have more likely than not changed an outcome, there must be little evidence aside from the now impeached witness's testimony, and the jury must have accepted that testimony without question. Id.; cf. Wainwright v. Sec'y, Fla. Dep't of Corr., No. 20-13639, 2023 WL 4582786, at *6-7 (11th Cir. July 18, 2023) (per curiam) (explaining new evidence insufficient both when considered on its own and when considered together with other trial evidence), cert. denied sub nom., Wainwright v. Dixon, No. 23-6737, 144 S. Ct. 1363 (U.S. Apr. 15, 2024); High v. Head, 209 F.3d 1257, 1272 (11th Cir. 2000) ("We conclude, however, that in light of the substantial evidence that was produced at trial, including three different officers' testimony about [the petitioner's] confessions and the positive identification . . . none of this 'impeachment evidence provides [a] basis for finding a miscarriage of justice.'") (quoting Thompson, 523 U.S. at 563); see also Lynch v. Myers, No. 3:16CV73-WKW, 2018 WL 1867162, at *6 n.5 (M.D. Ala. Feb. 1, 2018) (citing Sawyer and Calderon for proposition "impeachment evidence does not provide sufficient evidence of actual innocence to overcome a time bar"), adopted by 2018 WL 1865168 (M.D. Ala. Apr. 18, 2018).

When assessing the impact of a Brady violation, the Court should not simply disregard the testimony that should have been impeached and determine whether a jury would have convicted Petitioner without that testimony.  Instead, the Court must assess what the jury would have done "in light of the new evidence."  Schlup, 513 U.S. at 327; Rozzelle, 672 F.3d at 1011.  In other words, had the allegedly improperly withheld Brady evidence

been used to impeach Osborne at trial, would no reasonable juror likely have convicted Petitioner?  The answer here is no.

As set forth above in Part I, the Georgia Supreme Court found numerous pieces of evidence in support of the jury's verdict.  Coggins, 750 S.E.2d at 332-33.  Despite Petitioner's adamant contention the Georgia Supreme Court factual recitation should be discounted because it is based on "unauthorized *in judicio* admissions made by" Petitioner's appellate counsel, as demonstrated by Respondent's recitation, complete with record citations, (doc. no. 16, pp. 13-14), there is evidence from multiple trial witnesses other than Osborne supporting the jury's guilty verdict.[9]  Moreover, Weber cross-examined Osborne about trading his testimony for a benefit, (doc. no. 14-10, pp. 149-10), the letter including Osborne's boast of wanting to trade his testimony went to the jury, (doc. no. 14-11, p. 180), and the jury heard from Petitioner himself that he never discussed his case with Osborne, (doc. no. 14-11, p. 58), already providing the jury with multiple reasons for questioning the credibility of Osborne's testimony.  Thus, while evidence of a leniency deal could have further discredited Osborne's testimony, in light of the other record evidence and doubt already cast on Osborne's testimony, the Court does not find a reasonable juror would have more likely than not responded with acquittal.

As explained, impeachment evidence is "a step removed from evidence pertaining to the crime itself" and generally insufficient on its own to satisfy the actual innocence exception, especially considering the other evidence supporting Petitioner's conviction.  See

---

[9]The evidence from these multiple witnesses is discussed in more detail in Part III(B)(2)(b) & (3), below.  That Petitioner now contests his appellate counsel's presentation of the documented trial evidence does not alter the actual innocence exception analysis.  That is, conflicting testimony, even without Osborne's challenged testimony, does not establish no reasonable juror would have convicted Petitioner.  See Rozzelle, 672 F.3d at 1016-17; Kuenzel, 880 F. Supp.2d at 1178, 1179; Rivera, 2017 WL 6035017, at *12.

Calderon, 523 U.S. at 563; High, 209 F.3d at 1272.  Moreover, Petitioner's reliance on

Williams does not carry the day as the "undermine confidence" standard associated with

post-conviction relief based on a Brady violation is easier to meet than the "no reasonable

juror would convict" standard used for the actual innocence exception.  As the Supreme

Court ruled in Wearry v. Cain, "To prevail on his Brady claim, [the petitioner] need not show

that he 'more likely than not' would have been acquitted had the new evidence been

admitted.  He must show only that the new evidence is sufficient to 'undermine confidence'

in the verdict."  577 U.S. 385, 392 (2016) (per curiam) (citations omitted); Williams, 714 F.

App'x at 963-64 ("A reasonable probability is a probability sufficient to undermine

confidence in the outcome . . . . The withheld evidence was material as it was reasonably

probable that a different outcome would have resulted if the prosecution had disclosed its

promise to Fitzgerald.")  Rather, this case is in line with Mitchell, 2022 WL 4362296, at *6,

in which an established Brady violation that provided the basis for habeas relief for one

defendant was insufficient to satisfy the actual innocence gateway exception of a co-

defendant whose federal petition was untimely.

　　　In sum, the alleged Brady violation does not satisfy the actual innocence gateway

exception.

### b.　Alleged False Testimony About Petitioner's Admissions

　　　As set forth above, Osborne testified at trial Petitioner had twice admitted to stabbing

the victim, (doc. no. 14-10, p. 142).  Also, letters sent to a local reporter that were written by

Osborne stated Tabor told him he held the murder victim while Petitioner stabbed him.

(Doc. no. 14-11, pp. 145-49 (State's Ex. 23), 161-63 (State's Ex. 39 ).)  In an affidavit dated

August 28, 2018, Osborne attested he never met or spoke with Tabor and fabricated the

letters about Tabor holding the murder victim while Petitioner stabbed him, as well as fabricated the testimony regarding Petitioner's confession to him.[10]   (See doc. no. 14-6.)

Osborne's recantation offered over ten years after the original trial testimony is undoubtedly insufficient to satisfy the actual innocence exception.   As the Eleventh Circuit has observed:

> "recantations are viewed with extreme suspicion by the courts."  United States v. Santiago, 837 F.2d 1545, 1550 (11th Cir. 1988); United States v. Smith, 433 F.2d 149, 150–51 (5th Cir. 1970) (quoting Newman v. United States, 238 F.2d 861, 862 n.1 (5th Cir. 1956)).  This makes sense, because as Justice Brennan once explained, recantation testimony "upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction."  Dobbert v. Wainwright, 468 U.S. 1231, 1233–34, 105 S.Ct. 34, 36, 82 L.Ed.2d 925 (1984) (Brennan, J., dissenting).

In re Davis, 565 F.3d 810, 825 (11th Cir. 2009) (per curiam).   Collecting cases decided nationwide, the Southern District of Alabama remarked "recanting testimony is easy to find but difficult to confirm or refute:   witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial."  Taite v. Stewart, No. CV 13-00322-CG-N, 2016 WL 4154257, at *11–12 (S.D. Ala. June 28, 2016) (citation omitted), adopted by No. CV 13-00322-CG-N, 2016 WL 4148363 (S.D. Ala. Aug. 4, 2016). In other words, "[A] witness' later recantation of his trial testimony does not his earlier testimony false.  Rather, a witness' recantation is considered in addition to his trial testimony

---

[10]Petitioner makes much of the fact that Weber should have known Osborne's testimony was false because the standard jail policy of not housing co-defendants together meant Osborne could not have spoken with both Tabor and Petitioner.  (Doc. no. 14, p. 18; doc. no. 18, p. 13.) Aside from improperly arguing the merits of an ineffective assistance claim as support for the actual innocence exception, the state habeas court considered and rejected the argument it would have been impossible for Osborne to speak with Tabor and Petitioner.  (Doc. no. 13-13, pp. 5-8.)

and in the context in which he recanted when assessing the likely impact it would have on jurors." Id. at *12 (citation omitted).

The Court cannot view the recantation evidence with anything *other* than suspicion. Indeed, Petitioner himself recognizes the unreliability of "jail house snitch testimony," (doc. no. 14, p. 18), and yet now asks the Court to unquestionably accept that Osborne's recantation  - offered over ten years after the original sworn testimony at trial and while confined on a bench warrant for criminal attempt to commit a felony and several other charges - means that no reasonable juror would have convicted Petitioner.  In addition to the summary of evidence provided by the Georgia Supreme Court, 750 S.E.2d at 333, and in Respondent's briefing, (doc. no. 16, pp. 13-14), a review of the trial transcript reveals that multiple witnesses described Petitioner as one of several persons who fought with the victim as part of a drug and alcohol infused melee on the night of the murder who was known to carry a knife that was never recovered.  (See, e.g., doc. no. 14-9, pp. 114-20, Brandon Taylor; id. at 162, 172-73, Brittney Gleason; id. at 230, 235, 238, 240-41, Chris Jarrard; doc. no. 14-10, pp. 29, 64, Michel Ivey; id. at 166, 180, Amy Jarrard; doc. no. 14-11, pp. 15-16, Barry Tabor; id. at 42-52, 63-65, Petitioner.)  The jury heard Petitioner deny stabbing the victim, as well as deny ever speaking to Osborne, the other inmate, Robinson, or telling anyone he had killed somebody.  (Doc. no. 14-11, pp. 57-59.)  It was for the jury to decide the weight and credibility of the trial testimony.  See Combs v. State, 500 S.E.2d 328, 329 (Ga. 1997).

And while the recantation may serve as impeachment of Osborne's own trial testimony, it is still impeachment evidence, which, as explained above, is generally insufficient to support an actual innocence gateway claim.  See Calderon, 523 U.S. at 563;

<u>Wainwright</u>, 2023 WL 4582786, at *6-7; <u>High</u>, 209 F.3d at 1272.  The Court cannot now conclude that a recantation offered over ten years later, especially in light of all the other testimony sorted by the jury in the first instance, is the type of reliable and credible evidence that would result in no reasonable juror convicting Petitioner.

In sum, the inherently suspect, years-later recantation by Osborne does not meet the lofty burden of showing "it is more likely than not that no reasonable juror would have convicted [the petitioner]" with the new evidence of Osborne's recantation.  <u>McQuiggin</u>, 569 U.S. at 395; <u>Schlup</u>, 513 U.S. at 332 ("[T]he court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.").

### 3.      Evidence Known to Trial Counsel But Not Utilized

Petitioner's second category of "new evidence" consists of a laundry list of information gleaned from the Public Defender's file by Petitioner's current counsel and is premised on the argument that if only trial counsel had not relied on Tabor's counsel to investigate the case as part of the undisclosed joint defense agreement and utilized the information in his own file, Petitioner's innocence would have been established at trial. These items include:  co-defendant Tabor admitted to a deputy sheriff and to his girlfriend that he stabbed the victim in self-defense; there was blood from the victim found on co-defendant Tabor; unpresented witnesses could have refuted testimony from trial witnesses Brian Benning ("Benning") and William Brandon Taylor ("Taylor") that shortly after the murder, Petitioner admitted killing someone who had been stabbed.  (Doc. no. 14, pp. 8-10, 14, 21-22; doc. no. 18, pp. 5, 17, 19.)

To be sure, Petitioner's current counsel spends a substantial portion of his opposition briefing addressing the merits of his ineffective assistance of counsel claims, after having meticulously combed through the record – as it existed in the Public Defender's file – to find examples of conflicting testimony and evidence which he maintains would have proved Petitioner's innocence and shows why he believes the state habeas court erred in denying Petitioner relief.  (See generally doc. nos. 14, 18.)   However, such arguments about alternative information not used at trial that support the merits of his underlying federal ineffective assistance claims are but red herrings to the current determination before the Court as to whether Petitioner can satisfy the actual innocence exception so that the merits of his federal petition may even be *considered* despite the untimeliness.[11]   But by arguing trial counsel was ineffective for not utilizing available information at trial, Petitioner admits that all of the information in this category was available and discoverable at trial, albeit unused, and therefore it is not "new" as is required to satisfy the actual innocence gateway exception. See Rivera, 2017 WL 6035017, at *12 (finding "previously existing evidence that trial counsel had in its possession but failed to use" was not new evidence); Mitchell, 2022 WL 4362296, at *7.  And while the discovery of a joint defense agreement may be "new" in that it was not disclosed to Petitioner at trial, nothing about that agreement itself supports a finding of actual, factual innocence such that no reasonable juror would have convicted

---

[11]Although Petitioner's counsel has confusingly co-mingled arguments on the merits of his federal petition with the terminology that he is "truly innocent of this crime," (doc. no. 18, p. 19), the most telling aspect of Petitioner's briefing is the repeated concession that the Public Defender's file contained the information Petitioner now relies upon in an attempt to excuse his untimeliness, but trial counsel failed to utilize it.  (See, e.g., doc. no. 14, p. 8 (detailing evidence in Public Defender's file which was not presented at trial); id. at 9 (challenging state habeas decision that trial counsel did not provide ineffective assistance for failing to investigate facts or call witnesses to refute trial testimony regarding Petitioner's "alleged admission" of killing victim because trial counsel "had all of this information in the Public Defender's file").

Petitioner.  Rather, it is part and parcel of the merits of Petitioner's ineffective assistance claim, which as explained above, cannot be reached if the actual innocence exception is not met.

Although nothing in Petitioner's second category of evidence constitutes "new" evidence for the actual innocence exception, even if the Court were to consider it, Petitioner still could not meet his burden in light of the established record.  Briefly, the evidence supporting Petitioner's conviction, can be recapped as follows.  Petitioner confessed to two inmates in jail while awaiting trial, Robinson, (doc. no. 14-10, p. 128), and Osborne, (id. at 142), as well as confessed to two others shortly after the murder, Taylor and Benning, he had killed someone who had been stabbed, (doc. no. 14-9, pp. 122, 133, 191-92).  Taylor and another witness, Rachel Tapley, also testified Petitioner was known to carry a gator knife and had been seen with a knife earlier in the day of the murder.  (Id. at 75-78, 119-20.)  Jarrard testified he saw Petitioner and the victim fighting, after which the victim mumbled something like "you just stabbed me."  (Doc. no. 14-9, pp. 242, 257.)[12]

None of Petitioner's identified information regarding Tabor's alleged admission to a deputy sheriff and his girlfriend, the victim's blood on Tabor, and unpresented testimony to refute the testimony from Taylor and Benning regarding Petitioner's admissions to them, satisfies Petitioner's lofty burden to show no reasonable juror would have convicted him. Rather, it instead serves simply as contrasting information to what the jury did hear and weigh at trial.  As explained previously, impeachment evidence is not generally sufficient to support the actual innocence exception, particularly where, as here, there was other evidence

---

[12]In addition to the record citations, these facts were also acknowledged by the Georgia Supreme Court, Coggins, 750 S.E.2d at 333, and cited in Respondent's motion to dismiss briefing, (doc. no. 16, pp. 13-14).

to support the jury's verdict.  See Calderon, 523 U.S. at 563; Wainwright, 2023 WL 4582786, at *6-7; High, 209 F.3d at 1272.  In addition, "a mere accumulation of additional evidence that would have bolstered the defense and would have persuaded some jurors to acquit still is insufficient to propel a petitioner through the narrow [actual innocence] gateway."  Kuenzel, 880 F. Supp. 2d at 1179.

Moreover, for the sake of completeness, the Court points out a statement given to an officer that co-defendant put the victim "into the cement" is not a credible and reliable piece of evidence to meet Petitioner's actual innocence burden, particularly when there were multiple witnesses who testified Tabor had been one of several people seen fighting with the victim and/or holding down the victim at various points of the altercation leading to the victim's stabbing.  (See, e.g., doc. no. 14-9, pp. 114, 162, 173; doc. no. 14-10, p. 166; doc. no. 14-11, pp. 14-16.)  Indeed, Tabor himself testified at trial he threw the victim to the ground and got a bat once he saw the victim get a stick out of his truck, but he never swung it or used the bat in an offensive manner.  (Doc. no. 14-11, p. 15.)  Testimony about a group fight also provides at least a plausible explanation for finding the victim's blood on Tabor's clothing.  As to the admission Tabor made to his girlfriend concerning stabbing the victim in self-defense, (doc. no. 14-2, pp. 81-87), in announcing the decision to nolle pros the charges against Tabor mid-trial, the prosecution explained that after the girlfriend gave the statement, she failed a polygraph test, and admitted she had lied.  (Doc. no. 14-10, p. 113.)  Moreover, no other witness at trial had provided any information consistent with the girlfriend's discredited statement.  (Id. at 114.)  The remaining proposed evidence that could refute testimony concerning Petitioner's admissions to Taylor and Benning would attack witness

credibility or support a defense, which, as explained above do not satisfy the actual innocence exception.  See <u>Kuenzel</u>, 880 F. Supp. 2d at 1181.

In sum, even if Petitioner's second category of evidence derived from combing through the Public Defender's file were "new," and it is not, Petitioner has not shown it is the type of credible and reliable evidence that would satisfy the high burden to establish that this is the rare case where no reasonable fact finder could have found him guilty of the murder for which he was convicted.  See <u>McQuiggin</u>, 569 U.S. at 386; <u>Ray</u>, 272 F. App'x at 810-11. Thus, the fundamental miscarriage of justice exception does not save the untimely petition from dismissal.

## IV.    Conclusion

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Respondent's motion to dismiss be **GRANTED**, (doc. no. 12), this petition be **DISMISSED** as untimely, and a final judgment be **ENTERED** in favor of Respondent.

SO REPORTED and RECOMMENDED this 1st day of November, 2024, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA